## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                CRIMINAL ACTION NO. 2:17-cr-00035

MARKUS DAVIS,

        Defendant.

### MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Markus Davis's ("Defendant") Motion to Suppress (ECF No. 23). For the following reasons, the Court **DENIES** the motion.

#### I.  *PROCEDURAL BACKGROUND*

Defendant is charged in a single-count indictment with knowing possession of a firearm in and affecting interstate commerce by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (ECF No. 12.) On May 22, 2017, Defendant filed the pending motion to suppress any evidence seized during a search of Defendant's person that occurred during a traffic stop in the early morning hours of February 22, 2017, including the Taurus .45 caliber handgun identified in the indictment. On June 5, 2017, the Court conducted an evidentiary hearing on Defendant's Motion to Suppress.

## II.    FACTUAL BACKGROUND

The following facts were derived from the testimony and exhibits adduced during the June 5, 2017 hearing.[1]   The facts are not in dispute except where indicated.

In the early morning hours of February 21, 2017, the Charleston Police Department received two 911 calls regarding a brandishing incident at 907 Barton Street.   In the first, the caller told the dispatcher that a man and two women drove by his house in a maroon Chevrolet Caprice, pulling out firearms and talking about shooting people.   (Def.'s Ex. 3.)   In the second, the caller informed the dispatcher that the car had come back by the house after the police left the area.   (Def.'s Ex. 3.)   When asked if he would like to speak with an officer, the caller told the dispatcher they could send one if they wanted.[2]   (Def.'s Ex. 3.)   Officer Christian Harshbarger of the Charleston Police Department followed up on the calls, where he took a statement from the caller, who finally identified himself as Leandre London.   (Def.'s Ex. 1.)   Mr. London expanded on the information provided in the 911 calls, telling Officer Harshbarger that the car involved looked like an old cop car, that he spoke with the driver of the car, and that one of the female passengers threatened him with a .22 caliber handgun.   (Def.'s Ex. 1.)   Mr. London also provided Officer Harshbarger with a signed statement describing the incident.   (Def.'s Ex. 2.)

In the early hours of the following day, February 22, 2017, Sergeant S.M. Webb ("Sgt. Webb") was patrolling downtown Charleston.   While stopped at the traffic light on the corner of Capitol and Virginia Streets, Sgt. Webb saw a Maroon Chevrolet Caprice traveling east on Virginia Street.   Recognizing the vehicle from the descriptions of the car in the brandishing incident the

---

[1] These facts are primarily based on a rough draft of the evidentiary hearing transcript, and accordingly include few direct citations.   The parties are encouraged to request an official transcript from the court reporter should they desire to review any testimony from that hearing.
[2] The caller identified himself as "Troy Smith" in the first call and "Tony" in the second.

2

previous day, Sgt. Webb turned right onto Virginia Street to follow the vehicle. Sgt. Webb attempted to catch up with the vehicle, while he evaluated whether he had reasonable suspicion to stop the car. At some point after passing the intersection of Brooks and Virginia streets, Sgt. Webb saw that the driver of the vehicle was not wearing a seatbelt. Though it was dark, Sgt. Webb was able to observe this violation by looking at the driver's silhouette against street and traffic lights.[3]

Sgt. Webb was also able to observe the license plate, and he called over his radio to the Metro Police Unit to check the license plate number for the registered owner of the vehicle. The officer who checked the number informed Sgt. Webb that the car was a 1994 Chevrolet Caprice and was registered to Markus Davis and Katrina Artis. Sgt. Webb then notified another officer over the radio that he planned to stop the car at Elizabeth Street, and requested that the officer come to assist him. Another officer, Sgt. Peoples, asked Sgt. Webb over the radio if he knew those individuals. Sgt. Webb did not directly respond, but noted that the vehicle was similar to the vehicle involved in the brandishing incident the previous day.[4] Sgt. Peoples then advised over the radio that both of the registered owners of the vehicle had been in federal prison on firearm charges. Before the Caprice reached Elizabeth Street, the driver parked his car on the 1500 block of Virginia Street. Sgt. Webb stopped in the middle of the street behind the vehicle and turned his police lights on, initiating the traffic stop.

Defendant opened the door of his vehicle as if to exit, but Sgt. Webb immediately shouted at him that he should remain in the vehicle, and Defendant complied. Sgt. Webb remained in his

---

[3] Defendant disputes whether Sgt. Webb was actually able to observe that he was not wearing a seatbelt.
[4] Sgt. Webb referred to the previous day's events as "shots fired" calls at the time, but he clarified at the hearing that these were only brandishing complaints, and there are no allegations that weapons were discharged during the incident.

cruiser until the officer he had been communicating with, Officer McMaster, came into view driving the opposite direction on Virginia Street, and then he approached the driver's side of Defendant's vehicle.[5]   Officer McMaster parked his cruiser in the middle of the street in front of Defendant's car, effectively blocking him in.   Officer McMaster then exited his vehicle and joined Sgt. Webb by the driver's side window of Defendant's vehicle.   Defendant offered his license and registration, but Sgt. Webb did not take them, but instead asked Defendant to exit his vehicle. Defendant refused to exit his vehicle, repeatedly questioning Sgt. Webb on why he had to, and expressing his belief that a seatbelt violation was not a sufficient reason.   During the exchange, Defendant was moving his hands around inside the vehicle, including in the passenger's side area where Sgt. Webb could not easily see them.   Sgt. Webb explained that he intended to pat Defendant down for weapons, noting that he knew from prior experience that Defendant carried weapons.   Defendant insisted he did not have any weapons, and continued to protest the need to exit his vehicle and be searched as a violation of his rights.   After about two and a half minutes of this exchange, Defendant finally got out of his vehicle, but as he was turning around toward his car, Sgt. Webb perceived that he was reaching down in his waist area.[6]   Sgt. Webb, Officer McMaster, and one other officer on the scene pushed Defendant against his vehicle and though Defendant struggled against them, they eventually took him to the ground.   After bringing him to the ground, the officers put Defendant in handcuffs, and Sgt. Webb reported over his radio that they had made an arrest.   The officers ultimately stood Defendant back up, and proceeded to

---

[5] Sgt. Webb testified that he was able to identify the driver of the vehicle as Markus Davis, the Defendant, as he approached the driver's side window.
[6] Defendant argues that he was moving his hands up to put them on his car, not down toward his waist.

perform a search while he continued to protest that he was not carrying a weapon.   This search revealed the .45 caliber Taurus handgun listed in the indictment.

### III.    LEGAL STANDARD

"The burden of proof is on the party who seeks to suppress the evidence."   *United States v. Hunter*, 63 F. Supp. 3d 614, 619 (E.D. Va. 2014) (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981)).   However, given the well-established principle that a search conducted without a warrant is "per se unreasonable under the Fourth Amendment," *Katz v. United States*, 389 U.S. 347, 357 (1967), the United States bears the burden at a suppression hearing of proving by a preponderance of the evidence that a warrantless search or seizure did not violate the Fourth Amendment.   *See United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974) (noting that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence"); *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("[I]f a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search."); *Hunter*, 63 F. Supp. 3d at 619 ("Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence.").

During a pretrial hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge."   *Id.* (quoting *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir. 1993)) (internal citation omitted).   *See also Columbus-Am. Disc. Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995) ("[I]n the usual

case, the factfinder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written record of that evidence. Evaluation of the credibility of a live witness is the most obvious example." (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 623 (1993))).

## IV.    DISCUSSION

Defendant argues that both the stop of his vehicle and the subsequent search of his person on February 22, 2017, were unreasonable in violation of his Fourth Amendment rights.  "The basic purpose of [the Fourth] Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by government officials."  *Camara v. Mun. Ct. of San Francisco*, 387 U.S. 523, 528 (1967).  "The Fourth Amendment does not prohibit all searches [and seizures], only those that are unreasonable."  *United States v. Davis*, 690 F.3d 226, 241 (4th Cir. 2012). "Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place."  *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985).

Defendant's motion challenges the legality of the search and seizure in the following ways: (1) Sgt. Webb lacked probable cause to initiate the traffic stop; (2) even if the traffic stop was legitimate, Sgt. Webb unduly prolonged it; (3) Sgt. Webb lacked reasonable suspicion that Defendant was involved in crime as required for an investigatory stop; (4) Sgt. Webb lacked reasonable suspicion that Defendant may have been armed and dangerous as required for a *Terry* frisk; and (5) Sgt. Webb lacked probable cause to arrest Defendant for obstruction and search him incident to that arrest.

6

A.  *Lawfulness of the Traffic Stop*

"The '[t]emporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons with the meaning of [the Fourth Amendment].'"  *United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011) (alterations in original) (quoting *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). Thus, it is well-established that a traffic stop is subject to Fourth Amendment analysis.   "Because a traffic stop is more analogous to an investigative detention than a custodial arrest, [the Fourth Circuit] treat[s] a traffic stop, whether based on probable cause or reasonable suspicion, under the standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968)."  *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011).   Under that standard, the case law is clear that the observation of a traffic violation "provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop."  *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008).   An observed traffic violation justifies a stop even if the officer's true motivations are the investigation of unrelated criminal activity.  *See Whren v. United States*, 517 U.S. 806, 810–13 (1996).

A police officer is also justified in conducting "a brief investigatory stop" any time he "has reasonable suspicion that criminal activity may be afoot."  *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004).   Thus, *Terry* stops of vehicles can be based on reasonable suspicion of any kind of ongoing criminal activity and need not be related to any traffic violation.  *See United States v. Arvizu*, 534 U.S. 266, 277 (2002) (upholding investigative stop of vehicle where officer had reasonable suspicion to believe the driver was engaged in illegal smuggling activity); *United States v. Singh*, 363 F.3d 347, 355 (4th Cir. 2004) ("[I]t is elementary that the authorities are

entitled to stop a moving vehicle reasonably suspected of involvement in smuggling contraband, and they may briefly detain and investigate such a vehicle and its occupants.").

The Government argues that the stop was justifiable both as a traffic stop and as a *Terry* stop.   As noted above, Sgt. Webb would have had probable cause to make a traffic stop if he had observed Defendant commit a traffic violation.   Sgt. Webb explained that he observed that, while following Defendant's vehicle, he was able to see that Defendant was not wearing a seatbelt, a violation which would indisputably justify the stop.   However, Defendant argues that Webb's claim that he observed that Defendant was not wearing a seatbelt is "not credible."   As discussed above, Sgt. Webb explained at the hearing that he was able to see Defendant's silhouette in his vehicle due to some of the streetlights, and this allowed him to see that the driver's side seatbelt was not engaged.   The Court found Sgt. Webb's testimony on this issue to be credible, particularly as the dashboard camera video from his cruiser shows several instances where Defendant was clearly silhouetted by lights on the street, and no seatbelt is visible.   (Gov't's Ex. A.)   Sgt. Webb's testimony that he observed the seatbelt violation before initiating the stop is further corroborated by the fact that he explained to Defendant at the stop that the seatbelt violation was the reason for the stop, and Defendant acknowledged that he had not been wearing a seatbelt. (Gov't's Ex. B.)

Defendant argues in his brief, and emphasized at the hearing, that Sgt. Webb's motivation in pulling him over was to investigate the brandishing incidents the previous night.   However, as noted above, the reasonableness of the stop does not depend on what Sgt. Webb's subjective intentions were.   *See Whren*, 517 U.S. at 813.   Accordingly, because the evidence supports the

Government's claim that Sgt. Webb observed that Defendant was not wearing his seatbelt, Sgt. Webb had sufficient justification to initiate a traffic stop.[7]

Defendant also argues that even if Sgt. Webb had probable cause to stop him for a traffic violation, the stop was unduly prolonged.   The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision.   Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose.   *See Florida v. Royer*, 460 U.S. 491, 500 (1983).   Thus, once the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver "must be allowed to proceed on his way."   *United States v. Rusher*, 966 F.2d 868, 876 (4th Cir. 1992).   The "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."   *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015).   To extend the stop past the time necessary to perform these tasks, the officer must obtain consent or identify reasonable suspicion of criminal activity.   *See United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017) (citing *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015)).   However, if the driver obstructs the police officer's efforts in any way, a longer traffic stop would not be unreasonable.   *See United States v. Sharpe*, 470 U.S. 675, 687–88 (1985).

Defendant argues that Sgt. Webb never made any effort to perform the typical tasks of a traffic stop, and points out that he readily offered his license and registration after Sgt. Webb initiated the stop, and Sgt. Webb did not take them.   He contends that this shows that Sgt. Webb had no intention of treating the stop as normal traffic stop.   The Government argues that Defendant was the cause of any delay, by refusing to get out of his car or submit to a protective

---

[7] Because Sgt. Webb had probable cause to stop Defendant for a traffic violation, it is unnecessary to decide if he also had "reasonable suspicion" that Defendant was involved in crime as required for an investigatory stop.

search.   As discussed in detail below, Sgt. Webb had a right to ask Defendant to step out of his vehicle, and because he had a reasonable suspicion that Defendant may have been armed, he was justified in seeking to perform a protective search.   Since Defendant's refusal to comply with these legitimate requests was the source of the traffic stop's delay prior to his arrest, the Court finds that Sgt. Webb and the officers assisting him did not unduly prolong the traffic stop.

## B.  Lawfulness of the Search of Defendant's Person

It is well-established that "a police officer, 'as a matter of course,' may order the driver of a lawfully stopped car out of his vehicle."   *United States v. Sakyi*, 160 F.3d 164, 167 (4th Cir. 1998) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977)).   Once the driver is ordered out of his car, officers may "perform a patdown of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous."[8]   *Arizona v. Johnson*, 555 U.S. 323, 332 (2009) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117–18 (1998)).   Such a search is justified for the "the officer's protection and the safety of everyone on the scene."   *United States v. Robinson*, 846 F.3d 694, 696 (4th Cir. 2017) (citing *Mimms*, 434 U.S. at 112).   An officer's reasonable suspicion that a person may be armed and dangerous "is measured by the totality of the circumstances."   *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).   In making this determination, "multiple factors may be taken together to create a reasonable suspicion even where each factor, taken alone, would be insufficient."   *United States v. George*, 732 F.3d 296, 300 (4th Cir. 2013).   Courts should not find reasonable suspicion lacking "based merely on a piecemeal refutation of each individual fact and inference."   *Id.* (citations and quotations omitted).

---

[8]  This type of search is often referred to as a "*Terry* frisk," a "protective search," or a "protective frisk."

10

The Government argues that Sgt. Webb was justified in searching Defendant both under the grounds that he had a reasonable suspicion that Defendant may have been armed and dangerous, and because he legitimately arrested Defendant for the crime of obstruction and searched Defendant incident to that arrest.[9]   The Government argues that Sgt. Webb's suspicion that Defendant may have been armed was reasonable based on: (1) his knowledge that Defendant had been convicted of a firearms offense, (2) Defendant's failure to cooperate with Sgt. Webb's questions and commands and Defendant's nervous behavior, and (3) the similarity of the vehicle Defendant was driving to the vehicle described in the previous day's brandishing complaints. Defendant attacks each of these justifications in turn.

1.  Defendant's Criminal History

Defendant argues that Sgt. Webb's knowledge of his firearm conviction alone would be insufficient to justify reasonable suspicion he may have armed, citing the Fourth Circuit's statement that "[a] person's criminal record, standing alone, cannot justify a stop, although it can support a finding of reasonable suspicion when accompanied by more concrete indications of criminal activity." *United States v. Bryant*, 654 F. App'x 622, 627 (4th Cir. 2016) (internal quotations omitted).   However, this case addresses what is necessary for an officer to have reasonable suspicion that criminal activity is afoot—the standard for an investigatory stop—rather

---

[9] Searches incident to arrest are also an exception to the general warrant requirement of the Fourth Amendment. When conducting a search incident to arrest, an officer may search "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 763 (1969).   However, since Sgt. Webb was justified in conducting a protective frisk of Defendant on the grounds that he had a reasonable suspicion Defendant may have been armed and dangerous, it is unnecessary to decide if the search was also valid as a search incident to arrest. Defendant contests both rationales, but does not argue that the Government must prove that Sgt. Webb had probable cause to make the arrest because Defendant was arrested prior to the search.   Defendant apparently accepts that the search would also have been valid as a protective frisk.

than what would cause an officer to have a reasonable suspicion that a person may be armed and dangerous. The Fourth Circuit has recently noted that these two standards are not to be conflated. *See Robinson*, 846 F.3d at 698 ("[Defendant] confuses the standard for making stops—which requires a reasonable suspicion that a crime or other infraction has been or is being committed—with the standard for conducting a frisk—which requires both a lawful investigatory stop and a reasonable suspicion that the person stopped is armed and dangerous.").

While interpreting the applicable standard, the Fourth Circuit has held that "reasonable suspicion of a suspect's dangerousness need not be based solely on activities observed by the police during or just before the relevant police encounter, but can be based on the suspect's commission of violent crimes in the past—especially when those crimes indicate a high likelihood that the suspect will be 'armed and dangerous' when encountered in the future." *United States v. Holmes*, 376 F.3d 270, 278 (4th Cir. 2004) (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985)). Relying on this language, the Fourth Circuit found that a defendant's firearm convictions and pending charges, coupled with the officer's knowledge that the defendant carried firearms, was sufficient to support a reasonable suspicion that the defendant may have been armed and dangerous. *United States v. Spivey*, 287 F. App'x 240, 241 (4th Cir. 2008). In this case, it seems that Defendant's criminal record may be sufficient to justify Sgt. Webb's protective search. Just before he made the stop, Sgt. Webb had been informed over the radio that Defendant had been in federal prison on a firearm conviction. Additionally, the evidence adduced at the hearing shows that Sgt. Webb had prior experience with Defendant, including an incident at a police station where Sgt. Webb had to help other officers restrain Defendant while he attempted to fight them during a strip search. While this alone may not be reason to initiate an investigatory stop, that is not at

issue; the question is whether, once Sgt. Webb legitimately stopped Defendant, it was reasonable for him to frisk Defendant for weapons.  Sgt. Webb's knowledge that Defendant had a firearm conviction, coupled with his personal experience with Defendant, strongly supports his belief that Defendant may have been armed and dangerous.[10]

    2.  Defendant's Behavior

It is undisputed that Defendant refused Sgt. Webb's repeated requests to exit his vehicle, arguing that his rights were being violated.  The Government argues that this, coupled with Defendant's nervous behavior during the stop, supports Sgt. Webb's reasonable suspicion Defendant may have been armed and dangerous.  Defendant argues that his actions during the stop can be interpreted entirely as innocent behavior.  Defendant also argues that his behavior during much of the traffic stop could not have contributed to Sgt. Webb's decision to frisk him, as Sgt. Webb indicated very early on in the traffic stop that he intended to perform a frisk.  The Government is correct that nervous behavior, including shaking hands, can support a reasonable suspicion that a suspect may be armed and dangerous.  *United States v. Brooks*, No. 16-4059, 2017 WL 1400481, at *3 (4th Cir. Apr. 19, 2017) (citing *Branch*, 537 F.3d at 338).  However, Defendant is also correct that courts should be cautious in ascribing too much suspicion to "mild nervousness," as some nervousness is likely to come from any interaction with police.  *United States v. Massenburg*, 654 F.3d 480, 491 (4th Cir. 2011).

---

[10] The Court notes that *Spivey* suggests that a criminal history like Defendant's would be sufficient to justify a protective search by itself.  *See also United States v. Collins*, 650 F. Supp. 2d 527, 534 (S.D. W. Va. 2009), *aff'd*, 390 F. App'x 273 (4th Cir. 2010) (finding a protective frisk valid where the officer knew that the suspect had attacked a corrections officer while incarcerated).  However, it is unnecessary to decide if Sgt. Webb's knowledge of Defendant's criminal history alone provided a reasonable suspicion that Defendant may have been armed and dangerous, as other relevant factors were present.

The Court finds that Defendant's behavior during the stop offers some support for Sgt. Webb's reasonable suspicion that Defendant may have been armed and dangerous.   While nervousness was discussed in both parties' briefing, the evidence presented at the hearing did not demonstrate that Defendant was nervous prior to Sgt. Webb's request that Defendant exit his vehicle so he could perform a frisk.   Indeed, Defendant is correct that much of his behavior during the stop could not have factored in to Sgt. Webb's decision to search him, as he told Defendant that he planned to do so early in their exchange.[11]   Accordingly, only Defendant's initial resistance to Sgt. Webb's commands could have played a role in his decision to perform a protective frisk, not Defendant's continued defiance.   Prior to Sgt. Webb explaining that he was going to perform a frisk, he had observed Defendant start to get out of the car just after the stop was initiated, he had seen Defendant moving his hands around in his vehicle, including on the passenger's side, and he had talked to Defendant briefly.   The Court finds that Defendant's behavior during this limited interaction lends some support for Sgt. Webb's suspicion that Defendant was armed and dangerous.

   3.  The 911 Calls

Sgt. Webb also knew that Defendant's vehicle was similar to the description of a vehicle involved in two brandishing calls from the prior evening.   As brandishing necessarily involves a firearm, Sgt. Webb's belief that Defendant may have been involved with those incidents supports his suspicion that Defendant may have been armed during the traffic stop.   Defendant attacks the

---

[11] Although it is difficult to pinpoint with exact certainty how long Sgt. Webb had been talking to Defendant before telling him that he planned to search him for weapons, the video from the dashboard camera in Officer McMaster's cruiser shows that Sgt. Webb told Defendant he was going to pat him down about ten seconds after he initially asked him to step out of the car.   (Gov't's Ex. B.)   Considering the videos from Officer McMaster and Sgt. Webb's dashboard cameras together, it appears that Sgt. Webb declared his intent to frisk Defendant less than forty seconds after approaching the car.   (Gov't's Exs. A-B.)

reliability of the tips, arguing that they could not support either a reasonable suspicion defendant was involved in criminal activity or that he may have been armed and dangerous.[12]  Defendant makes much of perceived inconsistencies in the tips related to the brandishing calls, noting that the person who filed the complaints provided a different name each time he talked to the police. Based on this, Defendant seeks to have these calls treated as analogous to anonymous tips for the purpose of evaluating the weight they should be given.  The United States Supreme Court has noted that "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," *Alabama v. White*, 496 U.S. 325, 329 (1990), but that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'"  *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (quoting *White*, 496 U.S. at 327).  The presumption against the credibility of anonymous tipsters is based in part on the concern that, unlike identifiable tipsters, they cannot "be held responsible if [their] allegations turn out to be fabricated."  *Id.*; *see United States v. Quarles*, 330 F.3d 650, 655 (4th Cir. 2003).  The Fourth Circuit has explained that the credibility of an anonymous tip is bolstered if it provides substantial details about the alleged criminal activity, if it provides a basis for the caller's knowledge, or if the call provides a contemporaneous account of the alleged

---

[12] The Court notes that the case law regarding the treatment of anonymous tips primarily looks at these tips in the context of reasonable suspicion to initiate a stop, rather than reasonable suspicion that a legitimately stopped suspect may be armed and dangerous.  *See, e.g.*, *Bryant*, 654 F. App'x at 626-27 (analyzing an anonymous tip and finding that it did not support a reasonable suspicion of criminal activity as required for an investigatory stop); *United States v. Mitchell*, 388 F. App'x 328, 331-32 (4th Cir. 2010) (analyzing a tip's anonymity in the context of a *Terry* stop); *United States v. Quarles*, 330 F.3d 650, 654 (4th Cir. 2003).  However, as the Court has already determined that Sgt. Webb was justified in stopping Defendant for a traffic violation, it is unnecessary to decide if the tips could have provided reasonable suspicion for the purpose of an investigatory stop.  Though neither party addresses whether the concern over the reliability of anonymous tipsters applies equally to the inquiry into the reasonableness of the protective search, at least one Court of Appeals has held that it does.  *United States v. Graham*, 483 F.3d 431, 436 (6th Cir. 2007) ("Therefore, when acting on an anonymous tip, the same indicia of reliability required for a *Terry* stop are also required for a *Terry* search.").

criminal's activities.  *See United States v. Elston*, 479 F.3d 314, 318 (4th Cir. 2007) (citations and quotations omitted).

While the Court notes that the inconsistencies in the names Leandre London provided to the police factor into his credibility, it is not appropriate to treat him as an anonymous tipster. Though Mr. London provided false names in his two initial calls, he ultimately allowed a police officer to come to his residence, where he provided—and signed—a statement describing the incident about which he made the two 911 calls.   The Fourth Circuit has held that a tipster was not anonymous where, despite starting his 911 call without giving a name, he ultimately provided his name after the *Terry* stop had already been initiated.   *United States v. Mitchell*, 388 F. App'x 328, 331 (4th Cir. 2010) (citing *Quarles*, 330 F.3d at 652).   The fact that Mr. London ultimately provided his name and met with police eliminates the credibility concern that he could not be held responsible if his claims were determined to be fabricated.   While his tip was not specifically about Defendant, the fact that Defendant's car was similar to the description of the vehicle Mr. London reported seeing in the brandishing incident was an appropriate consideration in Sgt. Webb's reasonable suspicion that Defendant may have been armed and dangerous.

4.   Totality of the Circumstances

The Court finds that, considered together, Sgt. Webb's knowledge of Defendant's criminal history, Defendant's behavior immediately after the stop, and the similarity of the vehicle Defendant was driving to the vehicle involved in brandishing complaints the previous day provided Sgt. Webb with reasonable suspicion that Defendant may have been armed and dangerous, justifying a protective search.   Defendant's attempt to minimize each factor individually is the type of piecemeal attack the Fourth Circuit warned against in *George*.   While any of the factors

16

standing alone may have been insufficient, taken together they support a finding that Sgt. Webb's suspicion that Defendant may have been armed was reasonable.  Accordingly, the search that revealed that Defendant was carrying a .45 caliber handgun was not an unreasonable search in violation of the Fourth Amendment.

## V.    CONCLUSION

Because both Sgt. Webb's initial stop of Defendant's vehicle and his subsequent search of Defendant's person that revealed the Taurus .45 caliber handgun in the indictment were valid, Defendant's Fourth Amendment rights were not violated.   Accordingly, Defendant's Motion to Suppress (ECF No. 23) is **DENIED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        July 20, 2017

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

17